UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DAMOUS D. NETTLES, | ) | 1:11-cv-01201-AWI-JLT HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATIONS TO |
| | ) | GRANT RESPONDENT'S MOTION TO |
| | ) | DISMISS PETITION FOR WRIT OF HABEAS |
| v. | ) | CORPUS (Doc. 27) |
| | ) | |
| | ) | ORDER REQUIRING THAT OBJECTIONS BE |
| RAUL LOPEZ, | ) | FILED WITHIN TWENTY DAYS |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

The instant petition was filed on June 10, 2011, challenging disciplinary proceedings stemming from a rules violation report dated February 26, 2008. (Doc. 1, pp. 4-8). Petitioner, who is confined to a wheelchair and has medical problems that make bowel "accidents" recur, alleges that correctional officers forcibly removed him from his cell to retrofit his cell toilet pursuant to the Americans With Disabilities Act ("ADA") despite Petitioner's claim that retrofitting the toilet would made hygiene conditions in the cell worse, that correctional officers left him in the ADA shower for several hours, that one correctional officer then filed a false rules violation report alleging Petitioner threatened the correctional officer, and that correctional officers then confined Petitioner in administrative segregation for his alleged behavior and loss of thirty days' credits. (Doc. 1, pp. 1;

1  9). Petitioner alleges that other correctional officers "aided and abetted" the original officer to
2  facilitate the purportedly false rules violation report. (Id., p. 10). Finally, Petitioner contends that
3  the hearing officer improperly found him guilty of the rules violation, resulting in Petitioner's
4  confinement in administrative segregation and loss of thirty days' credits. (Id., pp. 32-36).
5         On July 28, 2011, the Court ordered Respondent to file a response to the petition within sixty
6  days. (Doc. 21). On September 29, 2011, Respondent filed the instant motion to dismiss,
7  contending that Petitioner has failed to state a claim upon which habeas relief can be granted. (Doc.
8  27). On October 24, 2011, Petitioner filed his opposition. (Doc. 29).

9                                    **DISCUSSION**

10        A. Procedural Grounds for Motion to Dismiss

11        Respondent has filed the instant motion to dismiss the petition for lack of habeas jurisdiction.
12  Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it
13  "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not
14  entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.
15        The Ninth Circuit has allowed Respondent's to file a motion to dismiss in lieu of an answer if
16  the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the
17  state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule
18  4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874
19  F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for
20  state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n.12 (E.D. Cal. 1982) (same).
21  Thus, a Respondent can file a motion to dismiss after the court orders a response, and the Court
22  should use Rule 4 standards to review the motion. See Hillery, 533 F. Supp. at 1194 & n. 12.
23        In this case, Respondent's motion to dismiss is based on a lack of habeas jurisdiction and
24  failure to state facts to support a habeas claim. Because Respondent's motion to dismiss is similar in
25  procedural standing to a motion to dismiss for failure to exhaust state remedies or for state
26  procedural default and Respondent has not yet filed a formal answer, the Court will review
27  Respondent's motion to dismiss pursuant to its authority under Rule 4.
28        Respondent's motion to dismiss argues that this Court lacks habeas jurisdiction because the

actions complained of, i.e., the filing of the allegedly false rules violation report and subsequent hearing at which Petitioner was found guilty, along with the punishment of confinement in administrative segregation and loss of credits, are not facts that are likely to accelerate Petitioner's eligibility for parole, and, hence, they do not impact the fact or duration of Petitioner's sentence to a degree that justifies habeas jurisdiction. (Doc. 27). Petitioner's opposition re-argues the claims in his petition, but makes no showing whatever that the guilty finding on this one rules violation would have any appreciable impact on a subsequent parole suitability hearing. (Doc. 29). For the reasons set forth below, the Court agrees with Respondent that the Court lacks habeas jurisdiction to consider the merits of Petitioner's claims, and therefore the Court recommends that the petition be dismissed.

      B. <u>Lack of Habeas Jurisdiction</u>.

          1. <u>Petitioner's 2009 Parole Suitability Hearing</u>.

Petitioner was convicted in 1990 of attempted first degree murder with use of a firearm. (Doc. 7, Ex. 1, p. 3). Although the chronology is not entirely clear, it appears that Petitioner had at least one parole suitability hearing, on July 8, 2004, before his most recent hearing held before the Board of Parole Hearings ("BPH"), on July 30, 2009. At the conclusion of the hearing, the BPH set forth its reasons for finding that Petitioner was not suitable for parole and that he posed an unreasonable risk or threat to public safety if released from prison. (Doc. 7, Ex. 12, pp. 150 et seq.). A fair reading of the hearing transcript strongly suggests that the BPH did not consider Petitioner to be even remotely suitable for parole. Petitioner was told by the BPH that the "atrocious and cruel" facts of the crime were still a reason to find Petitioner unsuitable. (<u>Id</u>., p. 150). Those facts indicated that Petitioner ordered the female victim into an alley and onto her hands and knees, placed a gun to her head, and shot her twice, then left her to die, all because she had called police when her boyfriend, Petitioner's brother, had assaulted her. (<u>Id</u>., p. 152). Although the victim survived, she suffered serious long-term injuries. (<u>Id</u>.).

Additionally, however, the BPH noted that Petitioner had a long criminal history beginning with Grand Theft Auto at the age of seventeen, possession of drugs, assault by force with a deadly weapon, battery on a peace officer, and robbery. (<u>Id</u>., p. 153). Petitioner was on parole at the time he committed the offense in this case. (<u>Id</u>.). Petitioner was also a substance abuser, including

cocaine, alcohol PCP and marijuana. (Id., p. 154). The BPH also pointed out that Petitioner had engaged in a pattern of minimizing his conduct regarding the crime, minimizing his substance abuse history, and refusing to participate in substance abuse programming while incarcerated. (Id., p. 155). The fact that Petitioner's custody score had risen from 229 to 255, just in the five years since his last parole hearing was also noted. (Id., p. 82).

Regarding Petitioner's prison disciplinary record, the Board heard evidence that Petitioner had been cited with disciplinary violations on seven occasions since his last parole hearing five years earlier: (1) On July 11, 2005, for refusing to give a urine sample (id., p. 94); (2) on February 1, 2006, for manipulating staff (id., p. 98); (3) on June 13, 2007, for willfully obstructing officers (id., p. 99); (4) on October 15, 2007, for refusing a test for controlled substances (id., p. 99); (5) on February 26, 2008, for threatening staff (id., p. 101); (6) on December 16, 2008 for jamming his cell door with a towel (id., p. 105); and (7) on January 6, 2009, for delaying a correctional officer (id., p. 103). One BPH member summed up the Board's viewpoint as follows:

> "Certainly your current mental state, and attitude demonstrates that you are extraordinarily self-absorbed and self-centered with a narcissistic personality. You really sit here, and would have us believe that after your criminal record, and your life crime, and your long history of discipline, serious discipline issues within the institutional setting, that now that you've made up your mind that you don't want to be that kind of guy anymore, and that now you're remorseful, like that's going to have to be good enough. That's not good enough, sir, You have to show by your actions."

(Id., p. 157). The Board went on to note as follows:

> You still do, and choose to do what you want to do when you want to do it. You challenge authority at every given opportunity, and although you may be right from time to time, based on your appeals on technical issues, it does not outweigh your continued disruptive, and argumentative attitude within the institutional setting. You've got a total of 46 115s since you've been incarcerated. Seven of those were since your last hearing in 2004. You have a total of 35 128(a)s, many of which were as a result of a reduced 115. Many of which are very, very serious disciplinary issues.

(Id., p. 158).

Based on the foregoing, the BPH concluded that Petitioner was unsuitable for parole because he currently posed an unreasonable risk of danger if released that required at least an additional ten years of incarceration. (Id., p. 162). As goals during that ten-year period, the Board recommended that Petitioner work toward reducing his custody level, upgrade his educational level, complete vocational programs offered in the prison, participate in self-help for substance abuse, read books

and complete book reports, and cooperate with prison clinicians in the completion of another clinical evaluation.  (Id., p. 163).

### 2. The Legal Standards For Habeas Jurisdiction

A federal court may only grant a petition for writ of habeas corpus if the petitioner can show that "he is in custody in violation of the Constitution . . . ."  28 U.S.C. § 2254(a).  A habeas corpus petition is the correct method for a prisoner to challenge the "legality or duration" of his confinement.  Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991), *quoting*, Preiser v. Rodriguez, 411 U.S. 475, 485 (1973); Hill v. McDonough, 547 U.S. 573, 579, 128 S.Ct. 2096 (2006)(challenges to the lawfulness of confinement or to particulars affecting its duration are the province of habeas corpus); Advisory Committee Notes to Rule 1 of the Rules Governing Section 2254 Cases.   In contrast, a civil rights action pursuant to 42 U.S.C. § 1983 is the proper method for a prisoner to challenge the conditions of that confinement.   McCarthy v. Bronson, 500 U.S. 136, 141-42 (1991); Preiser, 411 U.S. at 499; Badea, 931 F.2d at 574; Advisory Committee Notes to Rule 1 of the Rules Governing Section 2254 Cases.  While the United States Supreme Court has not addressed whether a challenge to a condition of confinement may be brought in habeas corpus, see Docken v. Chase, 393 F.3d 1024, 1028 (9th Cir. 2004), the Ninth Circuit has held that "habeas jurisdiction is absent, and a § 1983 action proper, where a successful challenge to a prison condition will *not necessarily* shorten the prisoner's sentence."  Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cir. 2003)(emphasis supplied).

### 3. The Result Of The Hearing On The February 26, 2008 Rules Violation Report Has No Discernable Impact On The Length Of Petitioner's Sentence.

In In re Dannenberg, 34 Cal.4th 1061 (2005), the California Supreme Court described the evolution of California's differing treatment of inmates sentenced pursuant to the determinate sentencing law ("DSL") and those sentenced under the indeterminate sentencing law ("ISL") as follows:

> For decades before 1977, California employed an "indeterminate" sentencing system for felonies.  The court imposed a statutory sentence expressed as a range between a minimum and maximum period of confinement–often life imprisonment–the offender must serve.  An inmate's actual period of incarceration within this range was under the exclusive control of the parole authority...During most of this period, parole dates were not set, and prisoners had no idea when their confinement would end, until the moment the parol authority decided they were ready for release.

> The DSL, adopted in 1976, largely abandoned this system....
>
> Under the DSL, most felonies are now subject, in the alternative, to three precise terms of years...The court selects one of these alternatives (the lower, middle, or upper term) when imposing sentence...The offender must serve this entire term, less applicable sentence credits, within prison walls, but must then be released for a further period of supervised parole....
>
> However, certain serious offenders, including "noncapital" murderers (i.e., those murderers not punishable by death or life without parole), remain subject to indeterminate sentences. These indeterminate sentences may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement....

In re Dannenberg, 34 Cal.4th at 1077-1080 (citations omitted).

Effective January 1, 1983, the California legislature added new § 2933 to the state Penal Code, which eliminated the prior credit-earning system and instituted a new system of "work-time" credits for performance in work assignments and educational programs up to a maximum of one day reduction in term for each day of performance. 70 Ops. Cal. Atty. Gen. 49 (1987). However, § 2933 applies *only* to persons sentenced under Penal Code §1170. Persons convicted under § 1170 are those convicted of an offense for which the specified sentence is one of three time periods of imprisonment in state prison. Cal. Pen. Code § 1168. Accordingly, since Petitioner, who was sentenced to an indeterminate sentence, was not sentenced under § 1170, he is not entitled to the normal work-time credits under § 2933 that are awarded to inmates serving determinate sentences.

Instead, Petitioner's credit-earning is governed by state regulations. Section 2290(a) of Title 15 provides as follows:

> "Life prisoners may earn post-conviction credit for each year spent in state prison. Post-conviction credit for time served prior to the hearing at which a parole date is established shall be considered at that parole consideration hearing. Thereafter, post-conviction credit for time served since the last hearing shall be considered at progressive hearings. In no case may post-conviction credit advance a release date earlier than the minimum eligible parole date." [1]

The suggested amount of post-conviction credit is "4 months for each year served since the date the life term started." Cal.Code.Regs., tit. 15, 2290(c). The BPH may grant more or less than four months depending on how much time the inmate's "performance, participation or behavior"

---

[1] Title 15 of the Code of California Regulations § 2000(b)(3) defines a "life prisoner" as "a prisoner serving a sentence of life with the possibility of parole." Life sentences may be imposed for, inter alia, attempted first degree murder. Cal. Code Regs., tit. 15, § 2000(b)(3)(O). Here, Petitioner was sentenced to a life term for attempted first degree murder. Accordingly, he falls within the provisions of this regulation vis-a-vis his credit-earning ability.

warrants. Id.

In order, however, to fully appreciate the limitations of Petitioner's credit-earning capacity as a life prisoner, a brief explanation of how California's parole system for life prisoners interacts with a life prisoner's credit-earning potential is necessary. A life prisoner's MEPD is the "earliest date on which an Indeterminate Sentence Law or life prisoner may be legally released on parole." See Cal. Code Regs., titl. 15, § 3000; see also Cal. Code Regs., tit. 15, § 2000(b)(67). The CDCR determines the MEPD. See Cal. Code Regs., tit. 15, § 2400. However, "[t]he length of time a prisoner must serve prior to actual release on parole is determined by the [BPH]." Id.

California law provides that, one year prior to a prisoner's MEPD, a BPH panel shall meet with the prisoner and shall set a release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(a). Thus, the prisoner's MEPD is the basis for the timing of the initial suitability hearing.

Following a parole denial, the BPH "shall hear each case annually thereafter," except that the BPH may schedule a subsequent hearing up to five years "after any hearing at which parole is denied" if the prisoner has been convicted of murder and the BPH finds "that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding in writing." Cal. Penal Code § 3041.5(b)(2).

Following a finding of parole suitability for an inmate convicted of a murder committed on or after November 8, 1978, the BPH sets a base term "established solely on the gravity of the base crime, taking into account all of the circumstances of that crime." Cal. Code Regs., tit. 15, § 2403(a). The BPH sets a base term by taking into account the "matrix" of suggested base terms, circumstances in aggravation and mitigation, and adjustments for enhancements or other offenses. See Cal. Code Regs., tit. 15, § 2403-2411. However, the BPH may impose a base term other than one provided in the matrix "if justified by the particular facts of the individual case...." Id. Once a base term is set, the BPH may consider awarding post-conviction credit to reduce the base term, up

1  to four months for each year served, depending on the prisoner's performance, participation, and
2  behavior while in prison. See Cal. Code Regs., tit. 15, § 2400-2410.
3        California Penal Code § 190(a) mandates the application of good behavior credits by the
4  CDCR against the minimum term for second degree murder, i.e., fifteen years, that is imposed by
5  that statute for purposes of establishing the MEPD. In re Dayan, 231 Cal.App.3d 184, 188 (1991).
6  However, nothing in the statute requires the BPH, or CDCR, to reapply those same credits to the
7  actual term it eventually sets for Petitioner's sentence if, and when, it determines that Petitioner is
8  eligible for parole. Id.; see also Cal. Code Regs., tit. 15, § 2400 ("The [Department of Correction
9  and Rehabilitation's] decisions pursuant to Penal Code §§ 2930 et seq. do not affect the [BPH's]
10 decision concerning post-conviction credit pursuant to these rules."). Thus, in theory, if a prisoner
11 were determined to be parole eligible at the earliest possible time, credits might be of some use in
12 actually reducing the amount of time a prisoner served before his initial parole suitability hearing
13 was set. See People v. Rowland, 134 Cal.App.3d 1, 13-14 (1982). However, the question of
14 Petitioner's actual release on parole will be determined only by the BPH, and no matter how much
15 time Petitioner has served, he will not be released until he has been found suitable for parole. Cal.
16 Pen. Code § 3041(b); Cal.Code Regs., tit. 15, § 2281(a).
17       Put simply, the credits that Petitioner is statutorily entitled to earn as a life prisoner can have
18 no direct impact upon the amount of time Petitioner must actually serve, unless and until the BPH
19 determines that he is suitable for parole and orders his release, if that time ever comes. Such credits
20 can only impact the establishment of the MEPD for purposes of scheduling a parole suitability
21 hearing date. Here, as of 2008, when the challenged rules violation report and hearing occurred,
22 Petitioner had long since passed his MEPD, which, necessarily, had occurred prior to his previous
23 parole suitability hearing in 2004. Accordingly, the fact that Petitioner was assessed a 30-day credit
24 loss in 2008 would not have had any appreciable impact on his MEPD, which had passed at least
25 four years earlier. Nor would it have any effect at all on when, if ever, the BPH finally decides that
26 Petitioner is suitable for release on parole and actually sets a parole release date.
27       There is thus no evidence in this record that the guilty finding for the February 26, 2008 rules
28 violation report had any direct impact on the BPH's decision of July 30, 2009 to deny parole

suitability for Petitioner.  As the Ninth Circuit has indicated, "habeas jurisdiction is absent, and a §1983 action proper, where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence." Ramirez, 334 F.3d at 858.  Here, it is patent that the credits earned by a life prisoner such as Petitioner will not "<u>necessarily</u> shorten" his sentence.

Moreover, the mere possibility of a denial of parole at some later time, where one of the considerations for parole is inaccurate information about an inmate's disciplinary record, does not amount to the denial of a liberty interest.  Sandin v. Connor, 515 U.S. 472, 484, 115 S.Ct. 2293 (1995).  In Sandin, the U.S. Supreme Court concluded that a possible loss of credits due to a disciplinary conviction was insufficient to give rise to a liberty interest where "[n]othing in [the State's] code requires the parole board to deny parole in the face of a misconduct record or to grant parole in its absence, even though misconduct is by regulation a relevant consideration." Sandin, 515 U.S. at 487.  The Court went on to note that "[t]he decision to release a prisoner rests on a myriad of considerations," and an inmate is generally "afforded procedural protection at this parole hearing in order to explain the circumstances behind his misconduct record." Id. at 487.  The Court held that "[t]he chance that a finding of misconduct will alter the balance is simply too attenuated to invoke the procedural guarantees of the Due Process Clause." Id.

After Sandin, in order to demonstrate a liberty interest, an inmate must show that a disciplinary conviction will *inevitably* lengthen the duration of the inmate's incarceration. Id. Petitioner has failed to do so in this instance, for the reasons set forth above.

Nor has Petitioner shown that the mere fact of the disciplinary conviction itself would have any significant impact on either the BPH's 2009 decision or some future decision.  As discussed, the BPH relied on a wide variety of factors that extended far beyond the mere fact of a true finding regarding a single rules violation report.  While, in addition to those many factors, the BPH may also have considered Petitioner's behavior while incarcerated, including the challenged rules violation report, as discussed above, Petitioner had been cited with 46 serious rules violations since his incarceration in 1990, and seven since his previous parole hearing in 2004.  Petitioner had also been cited 35 times for lesser rule violations, many of which were reduced from more serious charges.

Under such circumstances, the effect, if any, of a single disciplinary hearing, e.g., the hearing

held for the February 26, 2008 citation, on the BPH's 2009 parole suitability decision, would necessarily be negligible.  Looking forward, it is equally difficult to imagine that, when Petitioner has his next parole hearing in 2019, that one potentially flawed rules violation from 2008 could have any significant impact on the BPH's decision regarding Petitioner's suitability for parole.  Therefore, the Court cannot conclude that Petitioner's guilty finding as to the February 26, 2008 violation "inevitably lengthen[ed] the duration" of Petitioner's confinement; to the contrary, such a correlation is simply too attenuated to invoke the procedural guarantees of the Due Process Clause."  See Sandin, 515 U.S. at 487.[2]

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the motion to dismiss (Doc. 27), be GRANTED and the habeas corpus petition be DISMISSED for lack of habeas jurisdiction.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty (20) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **October 31, 2011**                                             /s/ Jennifer L. Thurston
                                                                                    UNITED STATES MAGISTRATE JUDGE

---

[2] Respondent also contends that, alternatively, the Petition should be dismissed for failure to plead specific facts to support his habeas claim. (Doc. 27, p. 4).  Specifically, Respondent argues that Petitioner has failed to include a copy of the hearing officers' decision and, since the hearing officer's allegedly wrongful determination is the gravamen of Petitioner's habeas claim, the claim must fail for failure to state facts supporting his claim for relief. (Id.).  While the Court is also troubled by Petitioner's repeated failure to include the hearing officer's report in any of his state petitions or in the instant petition, the Court need not reach this issue in light of the Court's Recommendation to dismiss the petition for lack of habeas jurisdiction.